IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Bobby L. Ingram, #08909-021, | ) | CIVIL ACTION NO. 9:12-2407-DCN-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Mildred L. Rivera, Warden; Larry | ) | |
| Whitman, AW (P); D. Phillip, MD; | ) | |
| T. Middleton, Mid-Level Provider; | ) | |
| E. Reed, MD Medical Officer; and | ) | |
| J. Glenn, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This action has been filed by the Plaintiff, pro se, pursuant to, inter alia, Bivens v.

Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).[1]  Plaintiff,

an inmate with the Federal Bureau of Prisons (BOP), alleges violations of his constitutional rights

---

[1]In Bivens, the Supreme Court established a direct cause of action under the Constitution of the United States against federal officials for the violation of federal constitutional rights. A Bivens claim is analogous to a claim against state officials under 42 U.S.C. § 1983. However, federal officials cannot be sued under 42 U.S.C. § 1983 because they do not act under color of *state* law. See Harlow v. Fitzgerald, 457 U.S. 800, 814-820 (1982). Harlow and progeny indicate that case law involving § 1983 claims is applicable in Bivens actions and *vice versa*. Farmer v. Brennan, 511 U.S. 825 (1994). See also Mitchell v. Forsyth, 472 U.S. 511, 530 (1985); Turner v. Dammon, 848 F.2d 440, 443-444 (4th Cir. 1988); Osabutey v. Welch, 857 F.2d 220, 221-223 (4th Cir. 1988); and Tarantino v. Baker, 825 F.2d 772, 773-775 (4th Cir. 1987), cert. denied, North Carolina v. Tarantino, 489 U.S. 1010 (1989).

- 1 -



and negligence by the named Defendants.

The Defendants filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on January 7, 2013.  As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on January 8, 2013, advising Plaintiff of the importance of a motion for summary judgment and of the need for him to file an adequate response.  Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case.  On January 17, 2013, Plaintiff  filed his own motion for summary judgment together with a motion for an extension of time to respond to the Defendants' motion.

The Defendants filed a memorandum in opposition to the Plaintiff's motion for summary judgment on January 29, 2013, and Plaintiff was granted an extension to March 8, 2013 to file his response to the Defendants' motion.  The time for Plaintiff to file any additional material in response to the Defendants' motion for summary judgment has now expired, with no additional substantive filings having been received from the Plaintiff other than a motion to compel filed on March 6, 2013, in which Plaintiff appears to be requesting copies of his medical records.[2]  The parties' motions are now before the Court for disposition.[3]

---

[2]It is noted that voluminous medical records are attached as exhibits to the Defendants' motion for summary judgment, a copy of which was served on the Plaintiff, and which has now been pending for over two months.

[3]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C.  The parties have all filed motions for summary judgment.  As these are dispositive motions, this Report and Recommendation is entered for review by the Court.



## Background and Evidence

Plaintiff alleges in his verified Amended Complaint[4] that (at this time he filed this lawsuit) he was a federal prisoner incarcerated at the Federal Correctional Institution in Estill, South Carolina.[5] Plaintiff alleges that he had been incarcerated at Estill since 2002, and that up until that time (Plaintiff has apparently been incarcerated since 1995), he was in generally good health. However, Plaintiff alleges that in 2008 or 2009 he began to see blood in his "blow", and that he had surgery in 2009 during which "four polmon" were removed from his stomach. Plaintiff alleges that he thereafter did not see any blood for a couple of months, but that the "institution" thereafter did not "do the right procedures, so they cancelled my appointment about two times and then I came to Hampton SC hospital in 2010 and they had to finish my surgery up and they got the other [four] polmon from [his] stomach".

Plaintiff alleges that he did not see any blood after that until the beginning of 2011, when he began seeing blood again. Plaintiff alleges he was seen every two months by the Defendant Dr. Phillip as well as by the Defendant Middleton, a "mid-level provider". Plaintiff alleges that he was having blood taken to make sure he was alright, but that after he was put into a Special Housing Unit (SHU) on May 26, 2011, no one "[took] the time to come by", so he wrote Middleton and asked her to come by and see him. Plaintiff alleges that this was in February 2012. Plaintiff alleges that Middleton did not come by to see him so he put in another request to see her, but she did not answer

---

[4]Plaintiff filed an Amended Complaint on December 21, 2012. In this Circuit, verified complaints by pro se prisoners are to be considered as affidavits. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

[5]Plaintiff has, since the filing of this action, been transferred to the Federal Correctional Institution in Florence, Colorado. See Court Docket No. 26 [Change of Address Notice].



or come by, so he wrote to Dr. Phillip in March of 2012, but was told that Dr. Phillip was no longer with the institution. Plaintiff alleges that he then wrote to the Defendant Dr. Reed, but he did not answer or come by, so in April 2012 he went to the SHU lieutenant, who emailed Middleton. Plaintiff alleges Middleton came by and did a "finger" test, which was "positive", but she told him there was nothing she could do to get the bleeding to stop because it was a chronic condition. Plaintiff alleges that Middleton told him that due to his "age and body . . . getting old . . . [they] don't have anything for [him]".

Plaintiff alleges that he asked to see Dr. Reed, and that Dr. Reed told him that he had read Middleton's report and that he [Reed] had the "same thing". Plaintiff alleges that he asked Reed how he had stopped his own bleeding but that Reed did not tell him. Plaintiff alleges that he talked to the Defendant Rivera, the Warden, and the Defendant Glenn (the "HSA"), but it was not until he spoke with the Defendant Whitman (the assistant Warden) that he finally told the Plaintiff that he would look into it. Plaintiff alleges that all of these individuals are aware of his situation and that the "pills" they are giving him are not doing anything. Plaintiff also alleges that on July 3, 2012, Dr. Reed put him on some ulcer pills, leading Plaintiff to wonder whether he has a bleeding ulcer. Plaintiff complains that he has lost five pounds (although he does not state over what period of time this occurred) and also that he is not having his blood checked often enough. Plaintiff alleges that he had his blood checked on June 13, 2012 and was scheduled to see Middleton on that date, but that she did not see him so he wrote to Dr. Reed on July 9, 2012, but received no answer.

Plaintiff alleges he filed a tort claim on April 13, 2012, and that (at the time of the filing of the Complaint) was "still fighting with them on the grievance". Plaintiff continues to allege



that all of the indivduals named as Defendants are aware of his situation, but are not doing anything. Plaintiff alleges that following the surgery ordered by Dr. Phillip, Dr. Reed "never did a test to see if I was bleeding or not" because he took Middleton's word about his condition. Plaintiff further complains that all Dr. Reed does is check his temperature and his weight and tells Plaintiff what he can do, but that none of what Dr. Reed has done has stopped the bleeding. Plaintiff alleges that while he needs help, "they are talking . . . ." Plaintiff complains that Dr. Reed should conduct more tests to find out what is going on, but concedes that Reed has changed his medication about five times in the last two months.

Plaintiff alleges that, even though he is "getting all this medication", the Defendants are being deliberately indifferent to his health, and seeks monetary damages. In an attachment to his original Complaint (part of his amended Complaint), Plaintiff complains about being transferred to Colorado, which Plaintiff feels was in "retaliation" for Plaintiff filing this lawsuit. See generally, Verified Amended Complaint. Plaintiff has also submitted numerous exhibits to his Complaint, including an Inmate Account Balance form, a copy of a letter from Senator Lindsey Graham, various other letters concerning legal assistance, copies of administrative remedy forms and grievances, and a request for copies of medical documents. See Plaintiff's Exhibits.

In support of summary judgment in the case, the Defendant Derick Phillip has submitted an affidavit wherein he attests that he is a medical doctor and was the Clinical Director at FCI Estill from April 29, 2009 to November 19, 2011. As Clinical Director, Phillip provided direct patient care to inmates and also supervised the provision of care to patients by various mid-level practitioners, including nurses and physician assistants. Dr. Phillip attests that he is familiar with the Plaintiff, who was housed at FCI Estill from April 10, 2002 to September 19, 2012.



Dr. Phillip attests that he personally examined Plaintiff regarding his complaints of rectal bleeding, and that Plaintiff has had a history of rectal bleeding since 2006. Dr. Phillip attests that Plaintiff has also had several other medical diagnoses, including proctitis, colitis, enteritis, chronic iron deficiency, anemia, chronic internal hemorrhoids, chronic pain, adjustment order with depressed mood, polyps, hyperlipidemia, and a positive PPD. Dr. Phillip attests that Plaintiff was monitored periodically every six months by the Chronic Care Clinic (CCC) while at FCI Estill, including when he was in the Special Housing Unit (SHU), and that lab work was generally ordered at each CCC appointment to monitor Plaintiff's chronic conditions.

Dr. Phillip attests that the first time he saw Plaintiff was on September 1, 2009 at his CCC appointment. Plaintiff complained of blood in his bowel movements, and his medical records show that he had had a colonoscopy two years previous to remove four polyps. Dr. Phillip attests that he examined the Plaintiff and assessed him with colonic polyps. Dr. Phillip advised Plaintiff that he was referring him to see a specialist to determine if he needed a followup colonoscopy, while also discussing primary prevention with the Plaintiff and continuing him on his medication regimen. Several lab test were also ordered to help to determine if Plaintiff was experiencing any significant blood loss, and Dr. Phillip attests that when he reviewed the lab results on November 6, 2009, they did not indicate a significant blood loss.

Dr. Phillip attests that he next saw the Plaintiff six months later, on March 18, 2010, for his scheduled CCC appointment. Plaintiff reported that he was intermittently having "pure blood and stool". Dr. Phillip attests that an examination showed no change in Plaintiff's medical condition, and he advised Plaintiff that he would check on the referral for him to see a specialist. Plaintiff was continued on his medication regimen, and more lab work was ordered in order to



monitor Plaintiff's various medical conditions. Dr. Phillip attests that he reviewed the lab results on April 8, 2010, which again showed no significant blood loss.

Dr. Phillip attests that Plaintiff's medical records showed that he was seen by the Defendant Middleton on August 3, 2010, when he signed up for sick call for rectal bleeding. Dr. Phillip attests that Middleton reviewed Plaintiff's medical records, which included the history of Plaintiff's 2007 colonoscopy. Phillip attests that it had been recommended that Plaintiff have a follow-up exam/colonoscopy in three years; therefore, Middleton submitted a consult for Plaintiff to be examined by a specialist. Dr. Phillip attests that Plaintiff was thereafter seen by a general surgeon on September 16, 2010, who noted that Plaintiff had some rectal bleeding but no blood in his stool. A colonoscopy was recommended, and Dr. Phillip attests that after he reviewed the specialist's report on September 19, 2010, he submitted a referral for Plaintiff to be scheduled for a colonoscopy.

Dr. Phillip attests that he and Middleton both saw the Plaintiff on October 1, 2010 for his regularly scheduled CCC visit. Dr. Phillip attests that Plaintiff was concerned that he had Hepatitis C. Dr. Phillip attests that lab results from March 2008 and May 2010 had indicated Hepatitis C, but the recent lab data had indicated that Plaintiff did not have this condition. Plaintiff's examination was unremarkable and his chronic care medications were renewed. Lab tests were also ordered, including a test to determine the type of Hepatitis C Plaintiff was infected with. Dr. Phillip attests that Plaintiff thereafter had a colonoscopy performed on October 8, 2010, which showed impressive inflammatory changes and friability in the region of the dentate line (i.e. the lining of Plaintiff's rectum is very thin and will in most cases bleed when he passes stool). Dr. Phillip attests that a biopsy was also performed, which showed chronic mucosal changes with mild mucosal

- 7 -



inflammation, but no cancer. Dr. Phillips attests that the surgeon recommended stool softeners and suppositories to lessen Plaintiff's bleeding.

Dr. Phillip attests that Plaintiff was returned to the institution following his colonoscopy, where he was seen by the Defendant Middleton and denied having any abdominal discomfort at that time. Plaintiff's medical records reflect that Middleton advised Plaintiff to report to medical immediately if he developed any abdominal pain, fever or chills, excess rectal bleeding, or any abnormal symptoms. Middleton also provided medication for hemorrhoids as recommended by the surgeon. Plaintiff was thereafter seen two times in November 2010 for a knot on his head, but he did not complain of any rectal bleeding at these visits.

Dr. Phillip attests that Plaintiff was seen by Middleton on December 30, 2010 for a followup appointment after his colonoscopy. Middleton informed Plaintiff that he had friability in the region of the dentate line with inflammatory changes, but that his pathology report confirmed that he did not have any type of cancer. Plaintiff reported no rectal bleeding at that time. Middleton provided Plaintiff with some medications, including medication for an iron deficiency, and ordered lab work to check on his various conditions. However, when Middleton saw Plaintiff again on March 18, 2011 for his CCC appointment, he told her he had quit taking his iron pill because they made him constipated. Lab work was again ordered, and Plaintiff's medications were renewed, including medication to help with his constipation.

Dr. Phillip attests that in April 2011, Plaintiff was seen at least six times by medical staff, including himself as well as the Defendants Middleton and Reed, in regard to a shoulder injury. Dr. Phillip attests that Plaintiff did not complain of any rectal bleeding during these visits. On January 22, 2011, Plaintiff was seen in the SHU sick call for a sore throat. He did not complain



of blood in his stool.

Dr. Phillip attests that Middleton saw Plaintiff again on October 31, 2011 for a CCC visit, at which time he told her that he still had a little bleeding when he went to the bathroom and that he wanted to make sure he did not have cancer. Dr. Phillip attests that Plaintiff was informed that while both his fecal matter tests and his October 2010 colonoscopy indicated that he had mild to moderate internal hemorrhoids, his 2010 pathology report had indicated that he did not have cancer. Plaintiff's medications were renewed, including a steroid to help stop bleeding, and lab work was again ordered. On December 29, 2011, Dr. Reed made an administrative note in Plaintiff's medical record indicating that he was complaining of a colitis flare up, and that Dr. Reed had renewed a steroidal medication. Plaintiff was seen again by Middleton on March 23, 2012, and after examination renewed his hemorrhoid medication and told him to follow up as needed. Dr. Phillip attests that Plaintiff was seen twice during sick call in April 2012 for complaints not related to this lawsuit, and that he did not complain of rectal bleeding during these visits.

Dr. Phillip attests that Plaintiff's medical records reveal that he was seen by Dr. Reed on May 18, 2012 for his regular six month CCC appointment. Plaintiff was assessed with colitis and GERD, his medications were renewed, and more labs were ordered. Dr. Reed stressed to the Plaintiff the importance of compliance with his medication regimen in order to help stop his rectal bleeding. On June 29, 2012, Dr. Reed noted that Plaintiff's lab reports indicated he had H Pylori (a bacteria which causes stomach irritation), and eradication therapy was initiated to treat Plaintiff for presumed gastritis. Dr. Phillip attests that Plaintiff had no symptoms to suggest occurrence of ulcers at that time.

Dr. Phillip attests that Plaintiff was seen at least four times in July and August 2012



for an ingrown toenail, including twice by Middleton. Phillip attests that Plaintiff did not complain of blood in his stool during any of these encounters. Middleton saw Plaintiff for the last time on October 4, 2012, during which Plaintiff complained of continued bleeding when he goes to the bathroom. Middleton explained Plaintiff's diagnosis to him, and that he would experience some rectal bleeding when he passes a stool. Plaintiff's treatment regimen was also explained to him, and it was pointed out that he had only been sixty-one percent compliant with taking his medications, since pharmacy records showed he had only had his prescriptions filled in May, June and July. Dr. Phillip attests that the importance of compliance with the medication regimen was again stressed to the Plaintiff, and that he needed to be one hundred percent compliant with his medication regimen to prevent bleeding. Results of his colonoscopy were again reviewed with him. Plaintiff was thereafter transferred from FCI Estill on October 9, 2012.

In summary, Dr. Phillip attests that Plaintiff's medical records show that Plaintiff received adequate medical care for his rectal bleeding while at FCI Estill. Plaintiff was monitored periodically every six months in CCC, and labs were ordered when medically indicated. Dr. Phillip attests that from September 1, 2009 through October 9, 2012, Plaintiff was seen by FCI Estill medical staff at least thirty-four times for various medical complaints, including complaints other than of rectal bleeding. Further, Plaintiff's medical care and treatment did not change because of his placement in the SHU. With respect to Plaintiff's complaint of rectal bleeding, Plaintiff was seen at least sixteen times by medical staff, including two times by the consultant GI specialist. Dr. Phillip attests that there was no indication from any of Plaintiff's tests, including his colonoscopies, that he suffered bleeding to such a degree as would require staff to do anything more than monitor his health care concerns. Additionally, medical staff explained the results of his medical tests and



procedures, including that he did not have cancer; Plaintiff was counseled about his rectal bleeding; and the importance of Plaintiff being compliant with his medications was emphasized.  See generally, Phillip Affidavit.

In addition to Dr. Phillip's affidavit, the Defendants Tamala Middleton and Dr. Edward Reed have both submitted affidavits attesting to the extensive care, evaluation and treatment given to the Plaintiff during his time at FCI Estill, which testimony is consistent with the facts set forth by Dr. Phillip in his affidavit.  See generally, Middleton and Reed Affidavits.

The Defendant Judy Glenn has provided an affidavit wherein she attests that she is the Health Services Administrator (HSA) at FCI Estill.  Glenn attests that, in this position, she is responsible for overseeing the administrative functions of the Health Services Unit, including the medical records office, scheduling, ordering and pharmacy operations.  Glenn attests that she does not provide inmate medical treatment or care, and has no authority or duty to overrule the professional and informed decisions made by the physicians and medical staff.  Glenn attests that she does not recall receiving any Inmate Request to Staff Member forms from the Plaintiff, but that if she receives a request from an inmate, she normally refers the request to the primary medical provider, or if it is an issue she can address, she responds in writing.  Glenn attests that she did not ignore any requests from the Plaintiff.

Glenn also attests that she makes weekly rounds in the SHU and speaks to inmates during these visits .  Glenn attests that she recalls speaking to the Plaintiff once in the SHU, where he was inquiring about his medical care, and she had a nurse-practitioner see him in regard to his medical concerns.  Glenn further attests that Plaintiff was monitored periodically every six months in CCC while at FCI Estill, including when he was in the Special Housing Unit, and that generally

- 11 -



lab work was ordered at each CCC appointment to monitor Plaintiff's chronic conditions. Glenn attests that medical staff were aware of Plaintiff's medical complaints and problems regarding his rectal bleeding caused by proctitis, coitus, and hemorrhoids, and provided him thorough care on a regular basis for his condition. See generally, Glenn Affidavit.

The Defendant Mildred Rivera submitted an affidavit wherein she attests that she was the Warden at FCI Estill until she retired on September 28, 2012. Rivera attests that, as Warden, she had general oversight responsibilities for the operation of FCI Estill; however, she was not directly involved in the daily decisions that impacted inmates or their confinement at the facility. Rivera attests that she relied on subordinate managers in the various program and operations areas, and that with respect to medical care, she is not trained in the medical field, and relied upon the professional opinions of medical staff as to the proper course of treatment for inmates. With respect to the Plaintiff, Rivera attests that he filed an administrative grievance to her office alleging he was not being treated appropriately for his medical condition, and that in the response to Plaintiff's grievance (signed by Associate Warden Michael Robbins) and prepared by the subject matter experts, Plaintiff was informed that he was receiving appropriate medical treatment and followup. See generally, Rivera Affidavit.

The Defendant Larry Whitman has submitted an affidavit wherein he attests that he was the Association Warden for Operations and a Deputy to the Warden at FCI Estill during the relevant time period, but has since retired. Whitman attests that he was not directly involved in the daily decisions that impacted an inmate or his confinement at the facility, that he is not trained in the medical field, and that he relied upon the professional operations of medical staff as to the proper course of treatment for inmates. Whitman further attests that Plaintiff never spoke to him about his



medical concerns, but only about a possible transfer to another institution as well as about his concerns about being transferred to a Special Management Unit (SMU) after he participated in a riot on May 26, 2011. See generally, Whitman Affidavit.

The Defendants have also provided an affidavit from T. Horvath, a Case Manager at FCI Estill. Horvath attests that in this position he has access to central files and SENTRY documentation concerning inmates assigned to his case load. One of his responsibilities as case manager is to prepare the appropriate paperwork requesting transfer for inmates assigned to his case load, who are no longer suitable for the general population at FCI Estill because of disciplinary reasons. Horvath attests that Plaintiff is currently incarcerated at FCI Florence in Colorado as a result of a disciplinary transfer due to his involvement in a disturbance at FCI Estill on May 26, 2011. Horvath attests that Plaintiff was found guilty by a disciplinary hearing officer of engaging in a group demonstration and assaulting without serious injury, respectively, as well as for possessing a hazardous tool, following which he was transferred to the SMU at FCI Florence. Horvath attests that Plaintiff's transfer was due to his participation in a major disturbance, and was not in retaliation for utilizing the grievance process or filing a law suit. In fact, Horvath attests that the recommendation to have Plaintiff designated to an SMU facility was made on January 18, 2012, seven months before Plaintiff filed this lawsuit, which is dated August 17, 2012. See generally, Horvath Affidavit, with attached Exhibits (Disciplinary and Transfer Documents).

In addition to these exhibits, the Defendants have also submitted copies of various prison and medical records of the Plaintiff, and some grievance material. See generally, Defendants' Exhibits.

While the exhibits Plaintiff attached to his Complaint total twenty-five pages, he did



not submit any additional exhibits or evidence with his motion for summary judgment.

### Discussion

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990). Here, after careful review and consideration of the arguments and evidence presented, the undersigned concludes that the Defendants are entitled to summary judgment in this case.

### I.

### Bivens Claim

Each of the named Defendants is subject to suit for damages in their individual capacities in a Bivens action. However, in order to proceed with a Bivens claim for denial of medical care, Plaintiff must present evidence sufficient to create a genuine issue of fact as to whether

- 14 -



any named Defendant was deliberately indifferent to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Farmer v. Brennen, 511 U.S. 825, 837 (1994); Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986); Wester v. Jones, 554 F.2d 1285 (4th Cir. 1977); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975); Belcher v. Oliver, 898 F.2d 32 (4th Cir. 1990). Plaintiff has failed to submit any such evidence.

First, there is no evidence before this Court that the Defendants Rivera, Whitman, or Glenn were involved in any decisions made with respect to Plaintiff's medical care and treatment. These Defendants cannot be held liable in this case simply because they held supervisory positions at the prison, as the doctrines of vicarious liability and respondeat superior are not applicable in Bivens cases. See Vinnedge v. Gibbs, 550 F.2d 926, 927-929 & nn. 1-2 (4th Cir. 1977). Rather, in order to establish liability for any of these three Defendants, the evidence must be sufficient to create a genuine issue of fact as to whether any of these three Defendants was personally involved in deciding on and providing Plaintiff's medical care, or that the allegedly improper care was the result of an official policy or custom for which any of these Defendants was responsible. See generally, Dahl v. Weber, 580 F.3d 730, 733 (8th Cir. 2009)[Prison warden may be liable under § 1983 only if the warden is personally involved in, or directly responsible for, the prisoner's plight]; Slakan v. Porter, 737 F.2d 368, 375-376 (4th Cir. 1984), cert. denied, Reed v. Slakan, 470 U.S. 1035 (1985)[Supervisory official may be liable for actions of subordinates only where subordinates' allegedly unconstitutional conduct was the result of an official policy or custom for which the supervisory official was responsible]; Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), cert. denied, 115 S.Ct. 67 (1994); Fisher v. Washington Metro Area Transit Authority, 690 F.2d 1133, 1142-1143 (4th Cir. 1982), abrogated on other grounds, 500 U.S. 44 (1991) (citing Hall v. Tawney, 621 F.2d



607 (4th Cir. 1980)).

Here, even though the facts (construed most favorably to the Plaintiff) show that these Defendants may have been aware that Plaintiff was dissatisfied with his medical care, there is no evidence whatsoever to show that any of these three Defendants did anything other than rely on the medical personnel at the prison to provide Plaintiff's medical care, or that any medical care Plaintiff received was improper because of a custom or policy of any of these three Defendants or that these Defendants had personal knowledge that any medical care being provided was not proper. See Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) [officials entitled to rely on judgment of medical personnel]; Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) [officials entitled to rely on expertise of medical personnel]; see also Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], quoting Farmer v. Brennan, 511 U.S. at 837. Therefore, Rivera, Whitman and Glenn are entitled to dismissal as party Defendants in this case.

With respect to the remaining three Defendants, while these Defendants did provide medical care to the Plaintiff, Plaintiff has failed to present evidence sufficient to create a genuine issue of fact as to whether any of these Defendants was deliberately indifferent to his serious medical needs. Estelle, 429 U. S. at 106. To the contrary, the evidence before this Court shows that Plaintiff received continuous and ongoing treatment for his medical complaints. Plaintiff was regularly seen (not just for the medical complaints alleged in this lawsuit, but for various other medical problems as well) by nurses, nurse practitioners, and doctors, he has undergone at least two colonoscopies, and he was regularly provided with a battery of tests, profiles, and lab screens to



monitor and aid in the treatment of his medical problems. While it is readily apparent in the medical evidence that Plaintiff suffers from chronic medical conditions, there is no evidence that any Defendant has been deliberately indifferent to these conditions or to Plaintiff's complaints. Levy, No. 96-4705, 1997 WL 112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], quoting Farmer, 511 U.S. at 837; House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim].

    In addition to the voluminous medical records provided to the Court, the Defendants have also provided affidavits from two licensed physicians and an advanced registered nurse practitioner attesting to the extent, nature and quality of the medical care Plaintiff has received, and that Plaintiff has been provided effective and adequate medical care and treatment within the appropriate standard of care for his complaints. In contrast to this *medical evidence*, Plaintiff has presented no evidence to show that any named Defendant was deliberately indifferent to his medical needs, and Plaintiff's own personal opinion that his care was inadequate is not by itself sufficient to avoid summary judgment. See Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]); Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim]. Hence, while Plaintiff may not agree with the extent and nature of the medical care he received, he cannot simply allege in a conclusory fashion that he did not receive constitutionally adequate medical care or attention, otherwise provide no supporting



evidence, and expect to survive summary judgment, particularly when the Defendants have submitted medical documents and evidence which refute his claims. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)[Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim absent exceptional circumstances]; House, 824 F.Supp. at 485 [Plaintiff's conclusory allegations insufficient to maintain claim]; Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]. Therefore, Plaintiff's Bivens medical claim should be dismissed.

Finally, Plaintiff's conclusory and bare boned claim set forth in the amendment to his Complaint that the reason he was transferred to FCI Florence was because he was being retaliated against for filing this lawsuit, by itself and without any supporting facts or evidence, also fails to state a claim. The Defendants have submitted evidence to show that Plaintiff's transfer was because of a disciplinary conviction following a riot in May 2011, and that the recommendation for his transfer had been made prior to Plaintiff even filing this lawsuit. See Horvath Affidavit, with attached Exhibits. Plaintiff has provided no evidence whatsoever to counter the Defendants' evidence, or to show that he was transferred due to a retaliatory animus on the part of any named Defendant. See Atkinson v. Bohn, 91 F.3d 1127, 1129 (8th Cir. 1996) (per curium) [speculative and conclusory allegations cannot support retaliation claim]; LaCroix v. Williams, No. 97-0790, 2000 WL 1375737 at *4 (W.D.N.Y. Sept. 21, 2000) ["Plaintiff's conclusory allegations aside, there is simply nothing in the record to support his version of the facts and plaintiff's claim for retaliation fails"]. Therefore, Plaintiff's retaliation claim is without merit and should be dismissed. Woods v.



Edwards, 51 F.3d 577, 580-581 (5th Cir. 1995) [summary judgment affirmed where inmate offered no evidence other than his own personal belief that the alleged retaliatory actions were based on his exercise of his rights]; Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995)[case dismissed where Plaintiff produced nothing beyond his own conclusory allegations suggesting that prison official's actions were motivated by a retaliatory animus].

## II.

### Federal Tort Claims Act.

Plaintiff's Complaint could also be liberally construed as having asserted a negligence claim under the Federal Tort Claims Act (FTCA). The FTCA waives sovereign immunity and allows suits against the United States[6] for personal injuries caused by government employees acting within the scope of their employment. Under this Act, a plaintiff may recover a monetary award from the United States for damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope...of employment." 28 U.S.C. § 1346(b).[7] However, for the reasons set forth hereinbelow, the undersigned finds that Plaintiff has failed to submit evidence sufficient to give rise to a genuine issue of fact as to whether

---

[6]While the United States has not been named as a party Defendant in this action, Defendants do not assert this as a defense. Rather, the Defendants (through counsel) state in their brief that, with respect to Plaintiff's FTCA claim, they should be dismissed and the United States substituted as the proper FTCA Defendant. See Defendants' Brief, p. 5. Therefore, the undersigned has proceeded to address Plaintiff's FTCA claim on the merits.

[7]In order to obtain relief in federal court under the FTCA, a litigant must first have exhausted their administrative remedies. See 28 U.S.C. § 2675; McNeil v. United States, 508 U.S. 106, 113 (1993) ["The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."]. While the Defendants assert in their brief that Plaintiff failed to properly exhaust his administrative remedies under the FTCA prior to filing this lawsuit, they also state that the "Government does not object to proceeding on the merits of [Plaintiff's] FTCA claim even though [Plaintiff] has not properly exhausted his tort claim". See Defendants' Brief, p. 9.



a wrongful or negligent act for purposes of an FTCA claim was committed.

With respect to negligence, whether any government employee was negligent is to be determined "in accordance with the law of the place where the act or omission occurred," here the State of South Carolina.  28 U.S.C. § 1346(b).  In order to prove negligence in South Carolina, Plaintiff must prove by a preponderance of the evidence that 1) the Defendant had a legal duty of care; 2) the Defendant failed to discharge that duty; and 3) the Defendant's breach proximately caused him injury.  Ajaj v. United States, 479 F.Supp.2d 501, 549 (D.S.C. 2007); Goode v. St. Stephens United Methodist Church, 494 S.E.2d 827, 834 (S.C. 1997); Bailey v. Segars, No. 3370, 2001 WL 791740 (S.C.Ct.App. 2001); Hubbard v. Taylor, 529 S.E.2d 549 (S.C.Ct.App. 2000). Further, Plaintiff is required to show negligence with reasonable certainty, not through mere conjecture, and he may not attempt to prove negligence through the doctrine of res ipsa loquitur. Ajaj, 479 F.Supp.2d at 549; Eickhoff v. Beard-Laney, 20 S.E.2d 153, 155 (S.C. 1942); Crider v. Infinger Transportation Co., 148 S.E.2d 732, 734-735 (S.C. 1966).

Here, the Defendant concededly had a legal duty of care, as prison officials have a duty to provide appropriate medical care to prisoners.  While this duty can reach the level of a constitutional claim in so far as appropriate medical care for prisoners is mandated by the Eighth Amendment (see, discussion, supra), for purposes of an FTCA claim this duty is provided by statute; see 18 U.S.C. § 4042; which provides that the standard of duty owed is that of "reasonable care". See Johnson v. U. S. Government, 258 F.Supp. 372, 376 (E.D.Va. 1966)[Under Section 4042, a prison official's duty requires only the exercise of ordinary diligence under the circumstance]; see also In re Agent Orange Product Liability Litigation, 635 F.2d 987, 996 (2d Cir. 1980) [dissenting] (citing Owens v. Haas, 601 F.2d 1242 (2d Cir. 1979), cert. denied, 444 U.S. 980 (1979)); Harley v.



United States, No. 08-820, 2009 WL 187588 at * 4 (D.S.C. Jan. 26, 2009).

Plaintiff has provided no evidence to support the general and conclusory claims in his Complaint that prison officials did not provide him "reasonable care". To the contrary, the voluminous medical records provided as exhibits to this Court, together with the sworn testimony of Dr. Reed, Dr. Phillip and Nurse Practitioner Middleton, set forth a detailed record of the continuous and ongoing care Plaintiff was provided during the relevant time period, not just at the prison but by outside medical referrals as well. In contrast to this evidence of extensive and ongoing medical care, other than his own conclusory and self serving speculation Plaintiff has presented no evidence whatsoever to show that the medical care he received during the relevant time period was in any way improper. Specifically, Plaintiff has presented no evidence, such as affidavits from other medical professionals or any other type of medical evidence, to support his claim. Luckett v. United States, No. 08-13775, 2009 WL 1856417 at * 5 (E.D.Mich. June 29, 2009) (citing Lambert v. United States, 198 Fed.Appx. 835, 839 (11th Cir. 2006)[affirming dismissal of medical malpractice claim under FTCA where Plaintiff submitted only "his own conclusory allegations."]; cf. Scheckells, 423 F.Supp. 2d at 348 (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."].

In sum, after review of the evidence and arguments submitted to this Court in the light most favorable to the Plaintiff, the undersigned does not find that Plaintiff has presented a sufficient issue of material fact as to whether prison officials failed to exercise "ordinary diligence under the circumstances" with respect to his medical care. Nothing in the medical evidence provided to this Court supports Plaintiff's negligence claim, and his failure to provide any such



evidence is fatal to his claim. <u>Johnson</u>, 258 F.Supp. at 372 [duty of care only requires exercise of ordinary diligence under the circumstances]. The Defendant United States is therefore entitled to summary judgment on this claim. <u>Eickhof</u>, 205 S.E.2d at 156 [a plaintiff is required to show negligence with reasonable certainty, and not through mere conjecture]; <u>see</u> <u>Papasan</u>, 478 U.S. at 286 [courts need not assume the truth of legal conclusions couched as factual allegations]; <u>Morgan</u>, 829 F.2d at 12 ["even though <u>pro</u> <u>se</u> litigants are held to less stringent pleading standards then attorneys, the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; <u>House</u>, 824 F.Supp. at 485 [plaintiff's conclusory allegations insufficient to maintain claim].

<u>**Conclusion**</u>

Based on the foregoing, it is recommended that the Plaintiff's motion for summary judgment be **denied,** that the Defendants' motion for summary judgment be **granted**, and that this case be **dismissed**.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

March 15, 2013
Charleston, South Carolina



- 22 -

**Notice of Right to File Objections to Report and Recommendation**

  The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

  Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

  **Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

